UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MESHACH VALLADE,                                    **REPORT AND**
                                                    **RECOMMENDATION**
                            Plaintiff,

v.                                                  12-CV-00231(A)(M)

BRIAN FISCHER, J. CONWAY, SGT. DINO,
OFFICER SCOLESE, NURSE R. KILLINGER,
DR. ABBASEY, DR. LEKOWSKI, SANDRA PURSAK,
and P. CHAPPIUS,
                            Defendants.
_____

        Before me is defendants' motion for summary judgment [30].[1]   This motion,

being dispositive, has been referred to me by Hon. Richard J. Arcara for a Report and

Recommendation [39].  For the following reasons, I recommend that defendants' motion be

granted in part and denied in part.


                                **BACKGROUND**

        Plaintiff, an inmate, commenced this action *pro se* pursuant to 42 U.S.C. §1983

against various correction officers employed by the New York State Department of Corrections

and Community Supervision ("DOCCS").  Complaint [1]. His claims arise from a March 30,

2009 accident that occurred at the Attica Correctional Facility.


                        **The March 30, 2009 Accident**

        The Complaint [1] alleges that "[o]n or about March 30, [20]09 plaintiff was

coming back from recreation handcuffed behind his back while going up the stairs . . . [and]

_____

        [1]        Bracketed references are to the CM/ECF docket entries.

tripped in shoes (several sizes to[o] big for him). . .  and fell down many steps on the stairs" (id., p. 7 of 46, ¶3). He alleges that defendants Brian Kohl and Paul Scolese, the Correction Officers escorting him, "were deliberately indifferent to [his] safety by not holding him by the arms while he was going up the stairs" and "failed to protect [him] from falling and should of been aware of the potential hazard and injuries that could occur if an inmate fell down the stairs handcuffed behind the back" (id., pp. 7-8 of 46, ¶4).[2]

Discovery demonstrates that plaintiff arrived at Attica Correctional Facility in February 2009, and was housed on the second floor of the Special Housing Unit.  Statement of Undisputed Facts [30-1], ¶¶9-10.  Upon his arrival, his boots were taken and an admissions officer provided him with size 11 shoes for his size nine-and -a-half to10 feet (id., ¶¶11-14).[3] When plaintiff complained about the oversized shoes, he was directed to write to the "State Shop", which provides shoes for inmates (id., ¶¶15-16).

On March 30, 2009, plaintiff was escorted to recreation by defendants Scolese and Kohl (id., ¶36).[4]  When these officers returned to recreation to escort plaintiff back to his cell, defendant Scolese acknowledges that he "noticed that [plaintiff's] shoes were not on properly,

---

[2]      Plaintiff also asserted claims against defendants Conway and Fischer arising from the March 30, 2009 fall, which were dismissed, with prejudice, pursuant to 28 U.S.C. §§1915(e)(2)(B) and 1915A. See Vallade v. Fischer, 2012 WL 4103864, *3-4 (W.D.N.Y. 2012) (Curtin, J.).

[3]      When deposed plaintiff testified that his shoes were size nine-and-a-half, but stated in his April 3, 2009 grievance that he was a size 10.  Defendants' Statement of Undisputed Facts [30-1], ¶¶13-14.

[4]      Although defendants allege that plaintiff did not have any difficulty going down the stairs to recreation on March 30, 2009 (Defendants' Statement of Undisputed Facts [30-1], ¶46) the page they cite of plaintiff's deposition transcript (p. 30) in support of this allegation is not included in the record before me.  Plaintiff also testified that he had previously stumbled in his shoes in front of defendant Kohl.  Plaintiff's deposition transcript [31], p. 27 of 73.

and felt that this could cause him to fall and be injured.  When I pointed this out, [plaintiff] told me that his shoes were to big". Scolese Declaration [37], ¶8. Notwithstanding his belief that plaintiff's shoes could cause him to fall and be injured, defendant Scolese states - " I did not feel that he could be seriously injured due to the fact that he was being escorted by myself and another officer" (id., ¶18).  Unlike defendant Scolese, defendant Kohl states that when he escorted plaintiff on March 30, 2009, he "was not aware that his shoes did not fit properly". Kohl Declaration [34], ¶8.  However, this is disputed by plaintiff, who testified that defendant Kohl was aware that his shoes did not fit properly and that he had previously stumbled in front of defendant Kohl while wearing the oversized shoes. Plaintiff's deposition transcript [31], pp. 27-28 of 73.

While being escorted back to his cell,  plaintiff was handcuffed behind his back as required by DOCCS' and Attica's policies.  Defendants' Statement of Undisputed Facts [30-1],  ¶¶28-30, 48.  Plaintiff alleges that when he was almost to the top of the stairs his shoe slipped off and he tripped causing him to fall on his right shoulder (id., ¶¶55, 57, 58).[5]

Plaintiff testified that at the time of his fall defendants Scolese and Kohl were "rushing me, like oh, we gotta get back, we got to bring all these inmates back to the[ir] cells, so you . . . gotta hurry up.  So I'm like, you know, . . . [t]he sneakers are big on my feet.  I can't move as fast as you want me to.  So he kept saying you got to hurry up, hurry up". Plaintiff's deposition transcript [31], pp. 32-33 of 73.  Plaintiff also testified, consistent with his Complaint

---

[5]     Defendant Scolese's April 1, 2009 memorandum of the incident indicates that plaintiff fell on his knees.  Scolese Declaration [37], Ex. A, Bates No. 00046.

([1], pp. 7-8 of 46, ¶4), that neither officer was "even that close" to him and were not holding on to him as they ascended the stairs.  Plaintiff's deposition transcript [31], pp. 33-34 of 73.

By contrast, defendant Scolese states that he was holding plaintiff's arm the entire time (Scolese Declaration [37], ¶9), which appears consistent with the reports plaintiff provided in his grievances following the incident.  *See* Grievances dated April 3, 2009 [31], p. 71 of 73, Bates No. 00038 ("C.O. Scoles[e] wasn't firmly holding my arm so when I fell he wasn't able to stop me from hitting the steps"); May 15, 2009 [22], p. 13 of 175, Bates No. 00011 ("the escorting offices wasn't holding properly in case I fall which I did"); June 11, 2009 [22], p. 8 of 175, Bates No. 00006 ("I fell because of him not holding me properly").  Indeed, consistent with his reports following the incident, plaintiff's Affidavit submitted in opposition to defendants' motion for summary judgment alleges (contrary to the Complaint and his deposition testimony) that defendants Scolese and Kohl were holding him when he fell.  *See* Plaintiff's Affidavit [40], ¶5 ("defendants . . . were suppose to hold my arms or cuffs to provide support and stability, but having taken this walk routinely thousands of time, they may have relaxed their protocol and relaxed the firmness of their grips").

Following the fall, defendant Scolese asked plaintiff if he was alright, and he responded affirmatively.  Scolese Declaration [37], ¶10; Kohl Declaration [34], ¶¶10, 11.  Defendant Scolese then informed the second floor reception officers that plaintiff's shoes were too big.  Defendants' Statement of Undisputed Facts [30-1], ¶59.  The officers attempted to locate the proper size shoes for plaintiff, but none were found (id., ¶60).

-4-

**Retaliation**

Plaintiff's Complaint [1] alleges that "[o]n or about April 3, 2009 [defendant Dean Acquard, a Sergeant,] came to [his] cell harassing him and threatening him with bodily harm for writing grievances and letters to get a copy of the video tape where the fall happen[ed] . . . .  Plaintiff then wrote grievances on [defendant Acquard] for threatening him. Plaintiff started getting denied food and recreation because of his grievances and lived in fear of getting beat up. Plaintiff is on mental health's case load for psychiatric issues and this behavior by [defendant Acquard] hampered his ability to function and made him even more depressed and gave him bad anxiety" (id., p. 10 of 46, ¶¶9-10).[6]

Although plaintiff concedes that the grievance  defendant Acquard was reacting to was authored by him on April 3, 2009 (defendants' Statement of Undisputed Facts [30-1], ¶80; plaintiff's Rely [40], p. 1 of 5, ¶3), that grievance was not received by the Inmate Grievance Coordinator's Officer until April 7, 2009.  Defendants' Statement of Undisputed Facts [30-1], ¶¶80, 81.  Moreover, the April 3, 2009 grievance states - "On 4-3-09 right after lunch [defendant Acquard] came to my cell . . . and threaten me about not pursuing the incident on March 30, 2009 because he was the Sgt on duty when I fell and no medical attention was giv[en] to me". [33], p. 12 of 22, Bates No. 00039.  This suggests that defendant Acquard could not have been threatening retaliation for the April 3, 2009 grievance, but rather that the grievance was written in response to the threat.

---

[6]      Although the Complaint identifies this defendant as "Sgt. Dino", Dean Acquard has answered the Complaint and plaintiff does not dispute that this is the individual he sought to name as a defendant.  *See* Plaintiff's deposition transcript [31], p. 68 of 73.  Judge Curtin interpreted plaintiff's Complaint as not asserting an Eighth Amendment claim against defendant Acquard arising from the March 30, 2009 fall. *See* Vallade, 2012 WL 4103864, *2 n.1.

In any event, plaintiff conceded at his deposition that he was not deprived of food, but rather stopped eating because he did not trust the officers who provided him with the food (id., ¶¶82-83).  In an  apparent contradiction to his allegations of being denied recreation in retaliation for his complaints, his April 3, 2009 grievance states that his shoulder pain rendered him unable to participate in a number of activities. [33], p. 12 of 22,  Bates No. 000039.  He also testified that he stopped attending recreation because defendant Acquard threatened him. Defendants' Statement of Undisputed Facts [30-1], ¶84.

### Deliberate Indifference

The Complaint [1] alleges that following his March 30, 2009 fall, plaintiff "put in numerous sick calls to be seen and treated complaining of pain for approximately 5 weeks until he was taken to a Dr. and adequately treated" (id., p. 8 of 46, ¶6). The record demonstrates that to obtain medical attention, an inmate puts in for sick call to be seen by a nurse.  Defendants' Statement of Undisputed Facts [30-1], ¶87.   On April 1, 2009, plaintiff first complained of pain from the March 30, 2009 fall. [41-7], Bates No. 000515.[7]   At that time, a nurse gave plaintiff Ibuprofen for the pain and scheduled him to be seen by a doctor.  Defendants' Statement of Undisputed Facts [30-1], ¶99.  He was then again seen at sick call on April 2 and 4, 2009 for shoulder and hip pain and was given Tylenol. Defendants' Statement of Undisputed Facts [30-1],

---

[7]      Although plaintiff testified that it was not until April 1, 2009 that he first had an opportunity to advise the medical department of his injured shoulder (plaintiff's deposition transcript [31], p. 39 of 73), he was seen on March 31, 2009 by Nurse Hawley, and at that time requested lotion for his skin. [41-7], Bates No. 000515.  This is confirmed by plaintiff's own March 31, 2009 grievance against Nurse Hawley, alleging that she disregarded his itchy skin itchy. [22], p. 33 of 175, Bates No. 00031.

¶102; Laskowski Declaration [35], ¶¶11-12.  He continued to be seen on April 5 and 6, 2009 for complaints of "excruciating" shoulder and hip pain and was given Tylenol for his pain. Laskowski Declaration [35], ¶13.

Plaintiff was first seen by defendant Steven Laskowski, M.D.,[8] for complaints of right shoulder and hip pain on April 8, 2009. [41-7 ], Bates No. 000513.   At that time, defendant Laskowski examined him, ordered an x-ray and MRI, and provided him with Motrin. Defendants' Statement of Undisputed Facts [30-1], ¶¶104-08; Laskowski Declaration [35], ¶14; [41-7], Bates No. 000513. On April 19, 2009, DOCCS' Health Management Organization ("HMO") requested more information concerning defendant Laskowski's request for an MRI. Defendants' Statement of Undisputed Facts [30-1], ¶112. An MRI screening sheet was completed on April 21, 2009, which was part of the process necessary for obtaining authorization from the HMO. Laskowski Declaration [35], ¶21.  It is undisputed that defendant Laskowski lacked the authority to have an MRI performed without authorization from DOCCS or its HMO.  Defendants' Statement of Undisputed Facts [30-1], ¶113.

In the meantime, plaintiff continued to be seen at sick call on April 9, 11, 13, 15, 17, 20 and 24, 2009, and was provided with Tylenol or Ibuprofen for his complaints of pain (id., ¶111).  On April 26, 2009, plaintiff  requested to be seen by a doctor and was seen by Dr. Abbasey two days later (id., ¶¶115, 117).[9] Dr. Abbasey recommended an x-ray of plaintiff's shoulder and physical therapy and prescribed him Naprosyn (id., ¶118).  While awaiting his prescription of

---

[8]        In the Complaint he is identified as Dr. Lekowski.

[9]        The defendants' submissions identify him as Dr. Albassey.  I have adopted the spelling used on his DEA stamp contained in the medical records [41-3], p. 23 of 30.

Naprosyn, plaintiff was seen at sick call on May 2 and 4, 2009, and was given Motrin and Tylenol

for the pain (id., ¶120).

An x-ray of plaintiff's right shoulder was taken on May 5, 2009, which showed an

"acromioclavicular separation" (id., ¶122). On May 6, 2009, plaintiff was seen at sick call

complaining that his hip x-ray was not performed, but it was noted that no x-ray of his hip had

been ordered.  Laskowski Declaration [35], ¶28. On May 7, 2009, plaintiff complained that the

Naprosyn was causing stomach pains and on May 8, 2009, he reported that he had stopped taking

the Naprosyn and requested to be seen by a physician. Defendants' Statement of Undisputed Facts

[30-1], ¶¶125-26; Laskowski Declaration [35], ¶¶29-30.  On May 12, 2009, plaintiff was seen at

sick call for complaints of shoulder and hip pain, and he was provided with Tylenol. Defendants'

Statement of Undisputed Facts [30-1], ¶129.

Plaintiff was next seen by defendant Laskowski on May 14, 2009, and at that time

his assessment was a right hip contusion and a probable rotator cuff tear of the right shoulder (id.,

¶130).[10]  Defendant Laskowski's treatment plan was an x-ray of the right hip and shoulder and "to

consider an MRI". Laskowski Declaration [35], ¶32.  Plaintiff was also prescribed physical

therapy for his shoulder, but after being evaluated the therapist decided to delay physical therapy

due to the acromioclavicular separation.  Defendants' Statement of Undisputed Facts [30-1],

¶¶131- 32.

Plaintiff continued to seen at sick call on May 15, 17, 18 and 20, 2009, and was

given Tylenol for pain (id., ¶133). A second x-ray was performed on May 22, 2009, which showed

---

[10]     Curiously, defendant Laskowski's treatment notes state that plaintiff reported to him that he was involved in an altercation in early April 2009 resulting in an injury to his right shoulder and hip, suggesting that after his fall and after defendant Laskowski saw him on April 8, 2009, he sustained another injury.  Laskowski Declaration [35], ¶32; [41-7], Bates No. 00507.

that plaintiff's hip was normal and, contrary to the May 5, 2009 x-ray, showed that the acromioclavicle of the right shoulder "appear[ed] normal", but the radiologist "suggest[ed] weight bearing films to further evaluate the right AC joint". Defendants' Statement of Undisputed Facts [30-1], ¶134; Laskowski Declaration [35], ¶38; [41-4], Bates No. 000355.

Plaintiff continued to be seen at sick call on May 24 and 26, 2009, and was given Tylenol when he complained that Motrin upset his stomach. Defendants' Statement of Undisputed Facts [30-1], ¶135.  On May 27, 2009, plaintiff was seen by Physician's Assistant Debbie Graf for complaints of right shoulder pain. Laskowski Declaration [35], ¶40.  PA Graf referred him for an orthopedic consult and prescribed Percogesic since plaintiff was having trouble with other pain medications.  Defendants' Statement of Undisputed Facts [30-1], ¶136.  On June 3, 2009, plaintiff was seen at sick call for complaints of numbness in his right arm (id., ¶137).

Plaintiff was seen by defendant Laskowski for the third time on June 8, 2009, but this call-out was terminated by defendant Laskowski after plaintiff became belligerent (id., ¶138). On June 9, 2009, plaintiff was seen at sick call for complaints of pain. Laskowski Declaration [35], ¶44.  He was next seen on June 18, 2009 for complaints that the Percogesic was ineffective (id., ¶45).  At that time, it was noted that the orthopedic consult requested by PA Graf had been denied by DOCCS, and that a physician call-out was scheduled for early July (id.).  Plaintiff continued to be seen at sick call on June 20 and 21, 2009 for complaints of pain and was provided with Ibuprofen on June 21, 2009 (id., ¶¶46-47).

On June 26, 2009, plaintiff was examined by Dr. Abbasey, who discussed the results of the x-rays. Defendants' Statement of Undisputed Facts [30-1], ¶141.  At that time, it was noted that plaintiff had no deficits in motion (id.).  Plaintiff complained that the Percogesic

was causing itching and Dr. Abbasey prescribed Ibuprofen or Tylenol every eight hours for pain (id.).  However on June 29, 2009, plaintiff requested a refill of his Percogesic (id., ¶142).

On July 1, 2009, plaintiff was again evaluated for physical therapy, and the physical therapist noted "will try another trial of [treatment] per physician". [41-5], Bates No. 000396.  On that day, he was also seen at sick call for complaints of shoulder pain and pursuant to Dr. Abbasey's June 26, 2009 treatment notes, PA Graf prescribed Motrin to plaintiff, but he returned the Motrin the next day, stating - "I can't take that". Laskowski Declaration [35], ¶52; [41-7] Bates No. 503.  He returned to sick call on July 3, 2009, complaining that he could not take Motrin and was allergic to Percogesic, but this call was terminated when he became argumentative. Laskowski Declaration [35], ¶54.  He returned to sick call the following day for complaints of shoulder and right hip pain, and it was noted that he had been approved for physical therapy for his shoulder (id., ¶55).

Plaintiff was seen by defendant Laskowski for the fourth time on July 6, 2009. At that time, defendant Laskowski's impression was that plaintiff had a "right [acromioclavicle] separation" (id., ¶56).  His plan was to have an "occupational therapy evaluation scheduled" (id.). While Dr. Laskowski later treated plaintiff on March 15, 2010 for hypertension (Laskowski Declaration [35], ¶76), July 6, 2009  was the last time defendant Laskowski treated plaintiff for his shoulder and hip injuries.[11]

---

[11]     While defendant Laskowski also states that he examined plaintiff on September 19, 2011 (Laskowski Declaration [35], ¶100), the Ambulatory Health Record Progress Notes from that date do not appear to support this See [41-3], Bates No. 000317. In any event, they do not appear to relate to treatment for shoulder or hip pain, but rather injuries plaintiff sustained during an altercation with another inmate. See Laskowski Declaration [35], ¶93.

Plaintiff's complaints of right shoulder pain persisted.  On July 7 and 30, 2009, he was seen at sick call and provided with Tylenol. Defendants' Statement of Undisputed Facts [30-1], ¶147. Plaintiff commenced physical therapy on August 3, 2009, and received nine sessions before being discharged due to a lack of progress (id., ¶¶149, 150).

On August 10, 2009, plaintiff was seen by Dr. Abbasey, who offered plaintiff a shot of Cortisone, which he declined because he did not "like needles". [41-7], Bates No. 00497. Instead, Dr. Abbasey wrote a prescription for Indocin (id.).  Changing his mind, plaintiff made a request on August 27, 2009 to receive the injection and a call-out was scheduled with Dr. Abbasey, who provided him with an injection of Depromedal and Xylocaine.  Defendants' Statement of Undisputed Facts [30-1], ¶152.  At that time, Dr. Abbasey also extended his prescription for Indocin for ten more days (id.).

When plaintiff's complaints of shoulder pain resumed on October 19, 2009, he was provided with Ibuprofen (id., ¶153).  He returned to sick call on November 3, 2009, and requested to see a physician.  At that time he was given Tylenol. Laskowski Declaration [35], ¶68. He was then seen by a nurse on November 13 and 23, 2009, and was given Advil for his complaints of right shoulder pain (id., ¶¶69-70).

Plaintiff was next seen by Dr. Abbasey on December 21, 2009, and was referred for an orthopedic consultation, which was denied by the HMO. Defendants' Statement of Undisputed Facts [30-1], ¶¶155-56.  Dr. Abbasey's assessment was that plaintiff's shoulder affected his activities of daily living.  Laskowski Declaration [35], ¶71; [41-3] Bates No. 000325.

On February 5, 2010, plaintiff returned to sick call with complaints of pain in his shoulder.  Laskowski Declaration [35], ¶74. He was given Tylenol and scheduled to follow-up

with Dr. Abbasey (id.). Dr. Abbasey saw plaintiff on February 19, 2010, and he ordered an MRI

and prescribed Valtaren.  He also indicated that he would again request an orthopedic consultation

once the MRI was performed.  Defendants' Statement of Undisputed Facts [30-1], ¶159.  An MRI

was conducted on March 20, 2010, which found: "[m]inimal tendinosis is present of the

supraspinatus tendon. A rotator cuff tear is not seen. A small amount of fluid is present in the

subdeloid bursa.  The labrum has a normal appearance.  There is no tendon dislocation.  The AC

joint has no significant hypertrophy." [41-4], Bates No. 000353.  Plaintiff's prescription for

Valtaren was refilled on April 15, 2010. Defendants' Statement of Undisputed Facts [30-1], ¶162.

Plaintiff returned to sick call on April 29, 2010 for complaints of right shoulder

pain, and was provided with Motrin.  Laskowski Declaration [35], ¶80. Plaintiff was next

examined by Dr. Rao on May 6, 2010, who prescribed Fiorcet for ten days and recommended an

arm sling. Defendants' Statement of Undisputed Facts [30-1], ¶164.  He was then seen at sick call

on June 4, 8 and 18, 2010 for shoulder pain and was provided with Tylenol or Ibuprofen (id.,

¶165). Dr. Rao re-examined plaintiff on July 6, 2010, and made an orthopedic referral, which

resulted in a recommendation for surgery (a Mumford Procedure) by the orthopedic surgeon  (id.,

¶¶166-67).  According to Dr. Rao's notes, plaintiff declined the surgery.  [41-3 ], Bates No.

000319.  Although  plaintiff denies that he "ever refused a procedure" (plaintiff's Affidavit [40],

¶13), included in the record is a waiver dated August 12, 2010 signed by plaintiff, stating - "My

family told me not to get the surgery because they don't [*sic*] nothing to go wrong so they said

wait til I come home to get it done". [41-6], Bates No. 000468.

Plaintiff was next seen for shoulder pain on October 10, 2010, and provided with a

balm for his shoulder.  Defendants' Statement of Undisputed Facts [30-1], ¶171. He did not

complain of shoulder pain again until May 10, 2012 (id., ¶¶172-76). On June 8, 2012, plaintiff

was seen by Dr. Abbasey.   Dr. Abbasey's notes indicate that at that time plaintiff wanted to defer

surgery until he was released from custody next year and declined a Cortisone injection. [41-3],

Bates No. 000313. Plaintiff was not seen again by medical personnel before his transfer out of

Attica on August 24, 2012.  Defendants' Statement of Undisputed Facts [30-1], ¶178.

        Since leaving Attica, plaintiff has received medication, but no active treatment for

his shoulder (id., ¶182).  When asked at his deposition if "[a]side from the surgery . . . has any

doctor ever told you you should have any treatment that you haven't had?", plaintiff responded

"Nobody said nothing different".   Plaintiff's deposition transcript [31], p. 57 of 73.

Defendant Laskowski states that he was not plaintiff's primary care giver, a role performed by Dr.

Abbasey.  Laskowski [35], ¶101.**12**


### Access to Courts

        The plaintiff's Complaint [1] alleges that he wrote defendants Paul Chappius, the

Deputy Superintendent for Security at Attica,  and Sandra Prusak, the Inmate Records Coordinator

("IRC") at Attica, "to purchase a copy of the video coverage [of his fall] and was denied and

told it doesn't exist", which "was a lie in an attempt to cover up the fall"  (id., p. 9 of 46, ¶7).

The record demonstrates that the location of plaintiff's fall has security cameras. Defendants'

Statement of Undisputed Facts [30-1], ¶185. Defendant Chappius was responsible for

---

        12       Although the record before me encompasses the entirety of the medical treatment
plaintiff received at Attica following the March 30, 2009 fall, his deliberate indifference claims against
Drs. Rao and Abbasey and Nurse Killinger were dismissed, with prejudice. *See* Vallade, 2012 WL
4103864 at *4-6.

management of these security tapes.  Chappius Declaration [33], ¶¶1, 9.  Defendant Chappius states that unless the tape involves a use of force or other unusual incident, it is maintained for 14 days before being recycled (id., ¶10).  He also states that since there was no report of an inmate injury or use of force or unusual incident reports generated from plaintiff's fall, the recording would not have been considered significant and would not have been maintained for more than 14 days (id., ¶14).

Defendant Prusak is responsible for coordinating requests from inmates for documents and other items under New York's Freedom of Information Law ("FOIL").  Prusak Declaration [36], ¶4   The parties dispute when plaintiff requested the videotape and when he received a response to that request.  These documents, which are only maintained by the facility for one year,  were destroyed before the suit was filed.  Prusak Declaration [36], ¶21.

According to plaintiff, he wrote a letter to defendant Prusak requesting the videotape of the incident on March 31, 2009, and she responded a week later, advising him that the tape did not exist.  Plaintiff's deposition transcript [31], pp. 62-63 of 73.[13]  Supporting plaintiff's version of events, the record includes a letter from plaintiff dated April 3, 2009, complaining that defendant Prusak denied his request for the videotape. [36], p. 11 of 11, Bates No. 00083.  That letter was received in the DOCCS' Commissioner's Office in Albany, New York on April 16, 2009 (id.).

By contrast to plaintiff's version of events, defendants rely on the IRC FOIL log book, which  indicates that plaintiff's request for the videotape was received at the IRC office on

---

[13]   In response to defendants' motion, plaintiff's Affidavit [40] states, "annexed hereto as exhibit 'A' is a copy of plaintiffs letter to I.R.C. Sandra Pr[u]sak, and D.S.S. Paul W. Chappius" (id., ¶18), but that letter does not accompany the Affidavit.

April 6, 2009. [36], p. 7 of 11.[14]  It also shows that plaintiff's request for the videotape was

responded to on April 17, 2009 (id.).[15] The log book states that result of plaintiff's request was

"deny/appeal recycled 14 days" [36], p. 7 of 11.

Plaintiff also filed a grievance concerning the March 30, 2009 fall, and stated on

April 3, 2009, "I want the video and audio tapes reserved [*sic*] of this incident or allow me to

purchase a copy to be place[d] in my personal property". [33], p. 13 of 22. However, grievances

are filed with the Inmate Grievance Coordinator, not the IRC. Defendants' Statement of

Undisputed Facts [30-1], ¶216.


# ANALYSIS

### A.     The Summary Judgment Standard

"The standards governing summary judgment are well-settled. Summary judgment

is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law.  The party seeking summary judgment

has the burden to demonstrate that no genuine issue of material fact exists.  In determining

whether a genuine issue of material fact exists, a court must examine the evidence in the light

most favorable to, and draw all inferences in favor of, the non-movant.  Summary judgment is

---

[14]     Defendant Prusak states that she believes that the April 6, 2009 date on the log book is incorrect and that given the surrounding entries, the correct date is April 16, 2009. Prusak Declaration [36], ¶¶17-19.

[15]     In response to that portion of defendants' Statement of Undisputed Facts [30-1] alleging that plaintiff's request for the video was responded to on April 17, 2009 (id., ¶211),  plaintiff states he believes this allegation. Plaintiff's Reply [40], p. 1 of 5, ¶6.

improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

However, "[w]hen the moving party has carried its burden . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial* . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis in original). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

**B.      Timeliness of Claim Against Defendant Kohl**

"[T]he applicable statute of limitations for § 1983 actions in New York is three years". Murphy v. Lynn, 53 F.3d 547, 548 (2d Cir. 1995).  Here, the Complaint was filed on March 22, 2012, the eve of the expiration of the three-year statute of limitations, and identified defendant Kohl as a "John Doe" defendant.  Judge Curtin's screening Order requested the New York State Attorney General's Office to attempt to identify the John Doe defendant.  *See* Vallade, 2012 WL 4103864 at *3 n.2.  The New York State Attorney General's Office responded by identifying defendant Kohl, and he was added as a defendant by Judge Arcara on October 25, 2012 [10].

-16-

Defendants argue that plaintiff's failure to identify and substitute defendant Kohl as the John Doe defendant prior to the expiration of the statute of limitations renders the claim against him  untimely. Defendants' Memorandum of Law [30-2], Point I. They also argue that plaintiff fails to meet the requirements for the relation back of claims set forth in Fed. R. Civ. P. ("Rule") 15(c) (id.).  Although plaintiff does not respond to this portion of defendants' motion, the Second Circuit has recently instructed that where a *pro se* litigant makes a "partial response to a motion . . . . *i.e.*, referencing some claims or defenses but not others . . . . [,]the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate". Jackson v. Federal Express, __F.3d __, 2014 WL 4412333, *6 (2d Cir. 2014).

"For an Amended Complaint adding a new party to relate back under Rule 15(c)(1)(C), the following conditions must be met: (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity*, the original action would have been brought against it; and (4) the second and third criteria are fulfilled within 120 days of the filing of the Original Complaint, and the Original Complaint was filed within the limitations period." Hogan v. Fischer,  738 F.3d 509, 517 (2d Cir. 2013) (emphasis in original) (internal quotations omitted).  As argued by defendants, "Rule 15(c)(1)(C) makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a mistake of identity". Hogan,  738 F.3d at 518.  However, defendants ignore the fact that "even if a plaintiff's claims are barred by Rule 15(c)(1)(C), the Second Circuit has held that an amended pleading asserting §1983 claims against John Doe defendants may still relate

back under Rule 15(c)(1)(A)."  JCG v. Ercole,  2014 WL 1630815, *13  (S.D.N.Y.), adopted 2014 WL 2769120 (S.D.N.Y. 2014).

Rule 15(c)(1)(A) permits an amendment to a pleading to relate back to the date of the original pleading when "the law that provides the applicable statute of limitations allows relation back". "New York law provides a more forgiving principle of relation back in the John Doe context, compared to the federal relation back doctrine under Rule 15(c)." Strada v. City of New York, 2014 WL 3490306, *5 (E.D.N.Y. 2014).  "To take advantage of [New York Civil Practice Law and Rules] § 1024, a party must meet two requirements. First, the party must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name. Second, the party must describe the John Doe party in such form as will fairly apprise the party that he is the intended defendant." Hogan, 738 F.3d at 519 (internal quotations and citations omitted). Defendants make no attempt to address either of these requirements; therefore, I recommend that this portion of their motion be denied.


C.      **Eighth Amendment Violation: Deliberate Indifference to Plaintiff's Safety**

"The [Eighth] Amendment . . . imposes duties on . . . officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates". Farmer v. Brennan, 511 U.S. 825, 833 (1994). "[U]nder 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with 'deliberate indifference' to the safety of the inmate". Hayes v. New York City Department of Corrections, 84 F.3d 614, 620 (2d Cir. 1996).

"The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent . . . . The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes, 84 F.3d at 620  21. "[T]he subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result'".  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996) (*quoting* Farmer, 511 U.S. at 835).

In order to prevail, plaintiff "is not required to show that [defendant] acted 'with the very purpose of causing harm,' . . . but must demonstrate that [defendant] knew of and disregarded an excessive risk to his health and safety". Carbonell v. Goord, 2000 WL 760751, *8 (S.D.N.Y. 2000). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . .  and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842.

Initially, defendants argue that plaintiff's deposition testimony that neither defendants Scolese nor Kohl had a hold of his arm when he fell is a "recent contrivance" that should be rejected, given the contrary information he provided in the weeks following the fall. Defendants' Memorandum of Law [30-2], Point III.  "Where deposition and affidavit are in

conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken".  Russell v. Acme  Evans Co., 51 F.3d 64, 67  68 (7th Cir.1995).  Since in plaintiff's Affidavit opposing defendants' motion for summary judgment [40] he reverts to stating that defendants "relaxed the firmness of their grips and I fell down the stairs" (id., ¶5), an account that is consistent with his statements following the incident, I assume that his deposition testimony was mistaken and will disregard it for purposes of this motion.  Nonetheless, this is not dispositive of plaintiff's claim.

Defendants do not contest the objective prong of plaintiff's claim. Defendants' Memorandum of Law [30-2], p. 6. Instead, they argue that the subjective prong "is completely lacking" (id., p. 6). The crux of their argument is that there is "no evidence that [defendant Scolese] could have know known that the plaintiff could sustain a serious injury while going up (not down) the stairs" (id., p. 7).

"Courts . . . have concluded that forcing an inmate with an obvious impairment to . . . descend stairs without adequate assistance presents a triable issue of fact as to deliberate indifference." Krontz v. Westrick, 2009 WL 2633761, *3 (N.D.Ohio 2009).  This case is no different.  Defendant Scolese's acknowledgment that he recognized that plaintiff's shoes were not on properly and could cause him to fall (Scolese Declaration [37], ¶8), coupled with plaintiff's testimony that he was being rushed up the stairs while handcuffed behind the back (plaintiff's deposition testimony [31], pp. 32-33 of 73) and not properly supported by defendant Scolese (plaintiff's Affidavit [40], ¶5), is sufficient to raise a triable issue of fact as to whether defendant Scolese's conduct transcended mere negligence to deliberate indifference of a risk of serious injury.  Though defendants allege that there is a lesser degree of possible harm from  falling on

stairs while ascending as opposed to descending, this distinction is unavailing.  Whether ascending or descending, falling in a stairwell while handcuffed behind the back posses a risk of injury from an unbraced fall.

Alternatively, defendants argue that defendant Scolese and Kohl are entitled to qualified immunity for their actions.  Defendants' Memorandum of Law [30-2], p. 21. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known". Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  But even where a right is well established, a defendant may enjoy qualified immunity "if it was objectively reasonable for him to believe that his acts did not violate" that right. Frank v. Relin, 1 F.3d 1317, 1328 (2d Cir.), cert. denied, 510 U.S. 1012 (1993).

Defendants argue "at the time of the relevant events, an inmate's rights not to be escorted up a flight of stairs in shoes one and a half sizes too big, with his hands cuffed behind his back, was not clearly established as constitutional violations". Defendants' Memorandum of Law [30-2], p. 21.  This argument ignores the fact that "[t]he Eighth Amendment right of inmates '[t]o be furnished with the basic human needs, one of which is reasonable safety' is both clearly established and well-settled".   Armstrong v. Breslin, 2006 WL 436009, *5 (E.D.N.Y. 2006) (quoting Helling v. McKinney, 509 U.S. 25, 33 (1993)).

Defendants also argue that "[m]erely having the plaintiff walk upstairs while handcuffed behind, in shoes which were at most one and a half sizes too big, when plaintiff had no problem going down the same stairs in the same shoes several hours earlier, is an objectively

reasonable action which should be afforded qualified immunity protection". Defendants'

Memorandum of Law [30-2], p. 21.  However, given defendant Scolese's admission that he knew

that plaintiff's shoes were not on properly and could cause him to fall and be injured (Scolese

Declaration [37], ¶8) and the factual dispute as to whether Kohl had similar knowledge, I cannot

conclude as a matter of law that it would be objectively reasonable to rush plaintiff up the stairs

without sufficiently supporting him to prevent a fall. Therefore, I recommend that this portion of

defendants' motion be denied.


**D.     First Amendment Violation:  Retaliation**

Defendants argue that "the uncontested facts do not bear out that Acquard took

adverse action against the plaintiff, nor that there was a causal connection between the two".

Defendants' Memorandum of Law [30-2], p. 14.  Beyond challenging the "exploited distortion" of

Acquard's "unsworn statements", plaintiff appears to offer no other  arguments in response to this

portion of defendants' motion.  Plaintiff's Affidavit [40], ¶8.[16]

"Prisoners, like non-prisoners, have a constitutional right of access to the courts

and to petition the government for the redress of grievances, and prison officials may not retaliate

against prisoners for the exercise of that right." Colon v. Coughlin, 58 F.3d 865, 871  72 (2d Cir.

1995). To prevail on a claim of retaliation, an inmate bears the burden of showing "first, that he

engaged in constitutionally protected conduct and, second, that the conduct was a substantial or

motivating factor for the adverse actions taken by prison officials." Bennett v. Goord, 343 F.3d

---

[16]     While plaintiff challenges defendant Acquard's Declaration and the other declarations
submitted by defendants as being unsworn (Plaintiff's Affidavit [40], ¶8), unsworn declarations are
permitted pursuant to 28 U.S.C. §1746.

133, 137 (2d Cir. 2003).  *See* Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). "[B]ecause [of] . . . both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, . . . prisoners' claims of retaliation [are examined] with skepticism and particular care." Colon, 58 F.3d at 872.

As defendants argue, "[d]iscovery has shed new light on this claim". Defendants' Memorandum of Law [30-2], p. 11.  Whereas plaintiff alleged that he was deprived of food in retaliation for his grievances concerning the March 30, 2009 incident and subsequent threats by defendant Acquard  (Complaint [1], p. 10 of 46, ¶10), he later conceded that was not deprived of food, but rather ceased eating because he did not trust the food provided by the officers. Defendants' Statement of Undisputed Facts [30-1], ¶¶82, 83. Likewise, rather than being denied recreation as plaintiff alleges, he testified that he did not go to recreation because of defendant Acquard's threat (id., ¶84).

Moreover, plaintiff fails to establish a causal connection between the threats and his April 3, 2009 grievance.  In fact, the April 3, 2009 grievance was not prepared until *after* defendant Acquard's alleged threats. *See* Saunders v. Vinton,  554 Fed.Appx. 36, 39 (2d Cir. 2014) (Summary Order) ("any retaliation claim . . . would have failed, as the conduct did not deter him from continuing to file grievances").  Therefore, I recommend that this portion of defendants' motion be granted.

E.      **Eighth Amendment:  Deliberate Indifference to Plaintiff's Medical Needs**

In order to establish a violation of the Eighth Amendment arising out of inadequate medical treatment, plaintiff must prove that defendants acted with "deliberate indifference to [his]

serious medical needs". Estelle v. Gamble, 429 U.S. 97, 104 (1976).  As discussed above, the

deliberate indifference standard has both objective and subjective components. "[M]ere

disagreement over the proper treatment does not create a constitutional claim. So long as the

treatment given is adequate, the fact that a prisoner might prefer a different treatment does not

give rise to an Eighth Amendment violation." Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.

1998). Nevertheless, "[i]n certain instances, a physician may be deliberately indifferent if he or

she consciously chooses an easier and less efficacious treatment plan". Id.

   Defendants focus solely on the subjective component, arguing that defendant

Laskowski did not act with a "sufficiently culpable state of mind", since he was not plaintiff's

"primary medical provider" and that "while plaintiff is clearly dissatisfied with the treatment he

received . . .  the record indicates that the medical staff were anything but indifferent".

Defendants' Memorandum of Law [30-2], pp. 15-16. I agree with defendants.

   As defendants note, while plaintiff received treatment by various medical providers

at Attica for his shoulder and hip injuries, defendant Laskowski had only limited involvement in

his treatment, seeing him on the following four occasions for his complaints of shoulder and hip

pain:

  - -  On April 8, 2009, defendant Laskowski scheduled plaintiff for an x-ray

and MRI and gave him Motrin for his pain. Defendants' Statement of Undisputed Facts [30-1],

¶¶104-08; Laskowski Declaration ¶¶35, 14; [41-7] Bates No. 000513.  The x-ray was performed

on May 5, 2009. Laskowski Declaration [35], ¶27. Although the MRI was not performed at that

time, it is undisputed that defendant Laskowski's request was denied by DOCCS' HMO and that

he did not have authority to obtain an MRI without this approval.  Defendants' Statement of

Undisputed Facts [30-1], ¶113.

- -    On May 14, 2009, defendant Laskowski assessed plaintiff as having a right

hip contusion and a probable rotator cuff tear of the right shoulder (id., ¶130).  Defendant

Laskowski's treatment plan was an x-ray of the right hip and shoulder and to consider an MRI

(id.).  X-rays to recheck the results of the May 5, 2009 x-ray and to check the right hip were

performed on May 22, 2009. Laskowski Declaration [35], ¶38.

- -    On June 8, 2009, the call-out was terminated by defendant Laskowski after

plaintiff became belligerent. Defendants' Statement of Undisputed Facts [30-1], ¶138.

- -    On July 6, 2009, defendant Laskoski's impression was that plaintiff had a

"right [acromioclavicle] separation".  Laskowski Declaration [35], ¶56.  His plan was to have "an

occupational therapy evaluation scheduled" (id.).

In dismissing the deliberate indifference claims against defendant Dr. Abbasey,

Judge Curtin concluded that "[g]iven plaintiff's admission that he did receive treatment for his

injuries - in the form of x-rays, pain relief, medication and a shoulder sling - and that he was in

fact referred to and seen by an outside specialist, his allegations . . . amount at most to plaintiff's

disagreement with the treatment received, or a delay in treatment, i.e. the delay in referring him to

an outside specialist . . . . [S]uch allegations do not, without more, give rise to a claim of

deliberate indifference".  Vallade, 2012 WL 4103864 at *6.  The same holds true here.  Discovery

has demonstrated that defendant Laskowski attempted to diagnose and treat plaintiff's injuries

with pain medication, x-rays, an MRI, and physical therapy.  Nothing more has been established

in discovery.

Plaintiff's Complaint against defendant Laskowski was permitted to proceed based, in part, upon his attached June 8, 2009 grievance against defendant Laskowski, which alleged that he came to his cell on June 8, 2009 "acting very unprofessional with a wicked smirk on his face" and when plaintiff asked him to take his medical problems more seriously, he walked away without giving him the results of his May 22, 2009 x-ray. Complaint [1], p. 39 of 46. *See* Vallade, 2012 WL 4103864 at *6. However, discovery has demonstrated that defendant Laskowski terminated his June 8, 2009 call-out when plaintiff became belligerent. Defendants' Statement of Undisputed Facts [30-1], ¶138.[17]

While the treatment defendant Laskowski provided may not have alleviated plaintiff's complaints, "[m]ere negligence, or even medical malpractice, is not actionable". Vallade, 2012 WL 4103864 at *5. Even if defendant Laskowski had broader responsibility for plaintiff's medical care than the four occasions he treated plaintiff, the entirety of the care he received for his shoulder and hip conditions was similarly sufficient. As described by defendant Laskowski, plaintiff's treatment followed an "accepted course of starting with the most conservative treatment (i.e. pain medication), followed by more intensive treatment (physical therapy), before recommending the most invasive treatment (surgery)". Laskowski Declaration [35], ¶113. Although plaintiff may disagree with this course of treatment or its pace, "[d]eliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels that he did not get the level of medical attention that he desired." Shire v. Greiner, 2007 WL 840472, *12 (S.D.N.Y. 2007).

---

[17]     Instead of denying or attempting to contest this portion of defendants' Statement of Undisputed Facts, plaintiff merely responded that he lacks sufficient information to admit the truth or falsity of this allegation. Plaintiff's Reply [40], p. 1 of 5, ¶5.

Instead, plaintiff must establish that defendant "acted with a sufficiently culpable state of mind, i.e., deliberate indifference. [He] must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment." Tafari v. Stein, 2009 WL 331378, *6 (W.D.N.Y.2009) (Scott, M.J.), reconsideration denied, 2009 WL 1322317, 2009 WL 1579530.  No such evidence has been presented here. Therefore, I recommend that this portion of defendants' motion be granted.


## F.      Access to Courts

Defendants Prusak and Chappius argue, *inter alia*, that plaintiff "has not pled or alleged that defendants' actions hindered his efforts to pursue a legal claim".   Defendants' Memorandum of Law [30-2], p. 18. They note that "his claim has not been dismissed but has proceeded apace" and that "the recycling of the tape did not deny the plaintiff access to the Court" (id.).

"It is . . . established beyond doubt that prisoners have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821 (1977).  "The constitutional right of access is violated where government officials obstruct legitimate efforts to seek judicial redress." Whalen v. County of Fulton,  126 F.3d 400, 406 (2d Cir. 1997). "Courts of Appeals have recognized two variants of right-of-access claims." Sousa v. Marquez, 702 F.3d 124, 127 (2d Cir. 2012). Forward-looking claims exist where "'systemic official action' frustrated their ability to file a suit". Id. (*quoting* Christopher v. Harbury, 536 U.S. 403, 413 (2002)).  "The second variant of right-of-access claims is 'backward-looking access claims,'. . .  covering suits that 'cannot now be tried (*or tried with all material evidence*), no matter what official action may be in the future.'"

Id. at 127-28 (*quoting* Christopher, 536 U.S. at 413  14) (emphasis added).  "The official acts

claimed to have denied access may allegedly have caused the loss or inadequate settlement of a

meritorious case, . . . , the loss of an opportunity to sue, . . .  or the loss of an opportunity to seek

some particular order of relief". Christopher, 536 U.S. at 413-14.

        In either category of access to courts claim, "a plaintiff must show that the

defendants (1) engaged in deliberate and malicious conduct that (2) resulted in actual injury, *i.e.*,

that hindered the plaintiff's effort to pursue a legal claim". DeMeo v. Tucker, 509 Fed.Appx. 16,

18 (2d Cir. 2013) (Summary Order). *See* Pontervio v. Kaye, 2007 WL 141053, *9 (S.D.N.Y.),

recon. denied, 2007 WL 1029901 (S.D.N.Y. 2007), aff'd, 328 Fed.Appx. 671 (2d Cir. 2009)

(Summary Order) ("The essence of a denial of access claim is that a plaintiff must have

effectively lost (or was severely hampered in) the ability to file a lawsuit, typically by egregious or

systemic violations of due process"). "[T]he requirement of actual injury 'derives ultimately from

the doctrine of standing.'" Monsky v. Moraghan,  127 F.3d 243, 247 (2d Cir. 1997), cert. denied,

525 U.S. 823 (1998) (*quoting* Lewis v. Casey, 518 U.S. 343, 349 (1996)).

        Plaintiff's claim appears to be a backward-looking access claim.  Although not

argued by the defendants, the Second Circuit has recently recognized that "[t]he viability of

backward-looking right-of-access claims is far from clear in this Circuit".  Sousa, 702 F.3d 124 at

128.  Nonetheless, in addressing a backward-looking access suit arising from the government's

alleged concealment or manipulation of material facts during a prior civil suit, the Second Circuit

has stated that  "[s]uch claims, if recognized, would be available only if the governmental action

caused the plaintiff's suit to be dismissed as untimely. . . , or if official misconduct was so severe

as to 'render[ ] hollow his right to seek redress'" Id. (*quoting* Bell v. City of Milwaukee, 746 F.2d

1205, 1261 (7th Cir.1984), overruled on other grounds by Russ v. Watts, 414 F.3d 783 (7th Cir.

2005)).  Even if "if public officials withheld from the plaintiff 'key facts which would form the

basis of the . . . claims for redress'" (id. quoting Bell, 746 F.2d at 1261), such claims are available

only if a judicial remedy was 'completely foreclosed' by the . . . nondisclosure". Id. (quoting

Broudy v. Mather, 460 F.3d 106, 120 (D.C.Cir. 2006)).

       As plaintiff argues, the videotape constitutes "the best and definitive evidence" of

defendant Scolese's and Kohl's culpability.  Plaintiff's Affidavit [40], ¶22. See Harrell v. Cook,

169 F.3d 428, 432 (7th Cir. 1999) ("Deliberate destruction of evidence can sabotage a case . . . , if

it effectively deprives the plaintiff of essential proof").   Nonetheless, even if the tape was

willfully destroyed in an effort to cover-up defendants' conduct, plaintiff  has not established that

this caused him to lose or inadequately settle a meritorious action, since his underlying Eighth

Amendment claim arising from the March 30, 2009 accident remains pending.  See Parrish v.

Solis, 2014 WL 1921154, *13 (N.D. Cal.2014) ("Plaintiff has failed to allege or show the loss of

his underlying Eighth Amendment claim. Indeed, Plaintiff cannot allege the 'loss' of this claim at

this point in time because litigation of that claim is still pending in this very Court"); Broudy,  460

F.3d at 120 ("if relief on the underlying claims is still available in . . . a "presently existing claim',

the plaintiffs cannot meet [establish complete foreclosure]").

       Unlike an access to courts claim arising from the loss of a prior or current suit due

to the concealment of material facts, it remains to be seen what injury, if any, plaintiff may sustain

from the destruction of the video tape. "This leads to the conclusion not only that Plaintiff cannot

allege an actual injury for purposes of standing, but that his claim is premature and not ripe for

adjudication".  Parrish,  2014 WL 1921154 at *13. See  Lynch v. Barrett,  2010 WL 3938359, *6

(D.Colo. 2010) ("the damages Plaintiff would receive for his access-to-courts claim are presumptively the same as those he would receive for his excessive force claim. Recovery in both claims would, consequently, be superfluous. This fact supports the notion that Plaintiff has not yet experienced the requisite injury to bring his access-to-courts claim. Plaintiff has yet to experience a concrete injury, or denial of meaningful relief, and therefore, his access-to-courts claim is unripe"); Raymond v. Sloan,  2014 WL 4215378, *3 (D.Idaho 2014) ("At this stage in the litigation, it is premature to determine whether defendants' alleged cover-up will result in the defeat of her negligence claim. Instead of speculating upon the fate of that claim, the court will instead dismiss plaintiff's §1983 claim without prejudice").

Therefore, I recommend that defendants' motion be granted to the extent of dismissing plaintiff's access to courts claim, without prejudice.[18]


**CONCLUSION**

For these reasons, I recommend that defendants' motion for summary judgment [30] be granted to the extent it seeks dismissal of plaintiff's retaliation and deliberate indifference to medical needs claims, with prejudice, and plaintiff's access to courts claim, without prejudice, but otherwise be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by October 16, 2014 (applying the time frames set forth in Rules  6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this

---

[18]     Since I conclude that plaintiff's access to courts claim is premature, I have not addressed defendants' alternative arguments.

deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right

to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir.

1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

  Moreover, the district judge will ordinarily refuse to consider *de novo* arguments,

case law and/or evidentiary material which could have been, but were not, presented to the

magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale</u>

<u>Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

  The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local

Rules of Civil Procedure, written objections shall "specifically identify the portions of the

proposed findings and recommendations to which objection is made and the basis for each

objection . . . supported by legal authority", and must include "a written statement either certifying

that the objections do not raise new legal/factual arguments, or identifying the new arguments and

explaining why they were not raised to the Magistrate Judge".  Failure to comply with these

provisions may result in the district judge's refusal to consider the objections.


Dated:   September 29, 2014


      /s/ Jeremiah J. McCarthy
      JEREMIAH J. MCCARTHY
      United States Magistrate Judge